1

2

3          UNITED STATES DISTRICT COURT

4          NORTHERN DISTRICT OF CALIFORNIA

5

6

7    ELLIOT EISENBERG,

              Plaintiff,                        No. C 10-3208 PJH

8

       v.                              **ORDER GRANTING MOTION**
9                                          **FOR SUMMARY JUDGMENT**
     THE PERMANENTE MEDICAL GROUP,
10   et al.,

11            Defendants.
     _____/
12

13          Defendants' motions for summary judgment came on for hearing before the court on

14   December 14, 2011.  Plaintiff Elliot Eisenberg ("plaintiff" or "Eisenberg") appeared through

15   his counsel, William Rogers.  Defendants The Permanente Medical Group ("Kaiser Medical

16   Group"),  Kaiser Foundation Health Plan ("Kaiser Health Plan") and Kaiser Foundation

17   Hospitals ("Kaiser Hospitals")(all collectively "defendants") appeared through their

18   respective counsel, Wendy Lazerson, and Kari Erickson Levine.  Having read all the papers

19   submitted and carefully considered the relevant legal authority, the court hereby GRANTS

20   defendants' motions for summary judgment, for the reasons stated at the hearing, and as

21   follows.

22                              **BACKGROUND**

23          This is an action brought under the Americans with Disabilities Act ("ADA"), and Title

24   VII.[1]  Plaintiff has filed suit against defendants Kaiser Medical Group, Kaiser Health Plan,

25   and Kaiser Hospitals.

26

27   _____

28          [1]     Plaintiff originally asserted a claim under the Age Discrimination in Employment
     Act ("ADEA").  However, as confirmed at the hearing on the instant motions, plaintiff has now
     withdrawn the ADEA claim.

United States District Court

For the Northern District of California

A.      Undisputed Background Facts

Kaiser Hospitals, Kaiser Medical Group, and Kaiser Health Plan are distinct legal entities.  Kaiser Health Plan is a nonprofit, public benefit corporation.  It is licensed as a health care service plan and regulated by the California Department of Managed Health Care.  It enrolls members in individual and group health care plans, and in Northern California, provides hospital and medical services for its members through separate contracts with Kaiser Hospitals and Kaiser Medical Group.  Declaration of Victoria Zatkin ISO Mot. Summ. Jugdment ("Zatkin Decl."), ¶ 3.  Kaiser Hospitals is also a nonprofit, public benefit corporation that owns and operates hospitals in California and other states.  It provides hospital services for Kaiser Health Plan members through a written contract with Kaiser Health Plan called the Hospital Services Agreement.  See Zatkin Decl., ¶ 4.  Finally, Kaiser Medical Group is a professional corporation privately owned and managed by its physician shareholders.  The individual physicians are licensed and regulated by the Medical Board of California.  The Kaiser Medical Group contracts with Kaiser Health Plan to provide medical services for Kaiser Health Plan members through a written contract called the Medical Services Agreement.  Kaiser Hospitals, Kaiser Medical Group, and Kaiser Health Plan work in cooperation with each other to provide integrated medical care services under the name known to the general public as Kaiser Permanente.

Each Kaiser Hospital – including Kaiser Hospital Vallejo ("Kaiser Vallejo"), where plaintiff worked – has a Professional Staff Executive Committee ("PSEC") which accepts recommendations from the Credentials and Privileges Committee ("CP Committee") regarding physician qualifications for membership on the medical staff and for clinical privileges.  The PSEC is responsible for making recommendations for final action on physician privileges to the Kaiser Hospitals Board of Directors.  The CP Committee also makes all credentialing decisions on behalf of Kaiser Health Plan, which requires that any physicians treating Kaiser Health Plan members be credentialed.

Plaintiff Eisenberg was a physician ophthalmologist, and a shareholder and member

United States District Court

For the Northern District of California

1  of Kaiser Medical Group; he was not an employee of Kaiser Hospitals or Kaiser Health

2  Plan.  See Zatkin Decl., ¶¶ 3-4.  He was credentialed by Kaiser Health Plan to provide

3  patient care services to members of Kaiser Health Plan.  He was also a member of the

4  medical staff at Kaiser Vallejo Hospital and had surgical privileges to perform designated

5  ophthalmological procedures.  See Declaration of Steven Stricker ISO Mot. Summ.

6  Judgment ("Stricker Decl."), ¶ 7.  Plaintiff joined Kaiser Medical Group full time in 1987.  He

7  has never been subjected to a malpractice action, nor has he received a pre-lawsuit notice

8  of the intent to file a malpractice action.  See Declaration of Elliot Eisenberg ISO Mot.

9  Summ. Judgment Opp. ("Eisenberg Decl.", ¶ 2.

10  B.      Events Leading to Plaintiff's Employment Termination/Fair Hearing

11          Concerns with plaintiff's practice began as early as 1997.  See Declaration of Ellen

12  Kolarik ISO Mot. Summ. Judgment ("Kolarik Decl."), ¶¶ 2-3.  The Chief of Ophthalmology,

13  Dr. Ellen Kolarik, personally received complaints from other physicians and members of

14  clinical and non-clinical staff.  Complaints centered on plaintiff's lack of collegiality, refusal

15  to take on emergency cases or his share of the workload.  See id.  On more than one

16  occasion, plaintiff was criticized by peer physicians for refusing difficult cases or referring

17  them to other hospitals without obtaining the requisite approval from Dr. Kolarik.  Id.  On

18  other occasions, peer physicians raised concerns to Dr. Kolarik about the quality of care

19  plaintiff was providing patients.  Id.  Plaintiff also received low scores on Measure of Patient

20  Satisfaction surveys.  Stricker Decl., ¶ 8.

21          In May 2003, plaintiff – who asserts that his relationship with his supervisor Dr.

22  Kolarik, has been one of conflict – filed his first formal complaint against Dr. Kolarik.  He

23  then filed another one year later, in May 2004.  Eisenberg Decl., ¶¶ 10-11, Exs. 3-4.

24          In 2004, Dr. Kolarik and Dr. Stricker – Chief of Staff for Kaiser Vallejo – required that

25  plaintiff complete a quality improvement program involving a partnership with another

26  physician to learn about that physician's practice techniques and to have the physician give

27  plaintiff advice on patient interactions.  See Kolarik Decl., ¶ 4.  Plaintiff was supposed to

28

1  start the program in 2004 and complete it by 2005, but by 2008, still had not completed the

2  program. Id.

3       Also in 2004, Dr. Kolarik reduced plaintiffs' staff privileges regarding retinal

4  procedures.  The reason for the reduction was that plaintiff had not performed a certain

5  volume of retinal procedures during the previous years.  Plaintiff, however, had not

6  previously been informed that there was a certain volume of procedures necessary to

7  maintaining privileges regarding retinal procedures.  Eisenberg Decl., ¶ 12.

8       In August 2006, Dr. Kolarik forwarded four of plaintiff's cases to the Quality

9  Department for peer review.  The cases were forwarded because other physicians giving

10  follow up care for plaintiff's patients had raised concerns about plaintiff's prior treatment of

11  patients. See Declaration of Robert Quon ISO Mot. Summ. Judgment ("Quon Decl."), ¶¶ 2-

12  3.  All four cases were reviewed by the Surgical Services Peer Review Committee, and all

13  four cases were ultimately rated deficient: three received a rating of Standard of Care

14  ("SOC")-2 (which means "significant opportunity for improvement"), and one received a

15  rating of SOC-1 (which means "improvement opportunity identified").  Quon, Decl., ¶ 5,

16  Exs. F & G.

17       Meanwhile, the high incidence of deficient cases reviewed by the Quality

18  Department prompted Dr. Robert Quon, Chief of the Quality Department, to undertake a

19  Focused Practitioner Review, pursuant to Kaiser Hospital policy.  A Focused Review is

20  triggered when serious concerns about a physician's quality of care have been raised.  See

21  Quon Decl., ¶¶ 6-7, Exs. H-I.  As part of the Focused Practitioner Review, Dr. Quon used

22  diagnostic codes to identify representative cases of plaintiff's to be pulled from the prior two

23  year period.  In August 2007, two ophthalmologists, Drs. Diamant and Doyle, then reviewed

24  patient charts from a total of 65 surgical cases that had been selected based on the criteria

25  established by Dr. Quon.  Quon Decl., ¶¶ 6-7.  Of these 65 cases reviewed, ten received

26  scores of P-2, and twenty received scores of P-1 (the ratings had changed from SOC

27  ratings, and P-2 means significant deviation from standard of care, and P-1 means minor

28

4

United States District Court
For the Northern District of California

1   opportunity for improvement).  Quon Decl., ¶ 9.  Thus, 44% of the cases were rated as

2   problematic, and represented one of the worst Focused Practitioner Review results that Dr.

3   Quon had seen in his tenure.  Quon Decl., ¶ 9.

4          Associate Physician in Chief at Kaiser Hospital Vacaville, Dr. John Hills, an

5   ophthalmologist, then was asked to review the ten P-2 cases, and to perform a synthesis of

6   the results and to place them in context with respect to acceptable practice patterns for an

7   ophthalmologist at Kaiser Hospitals/Kaiser Health Plan.  Dr. Hills did not disagree with the

8   scoring of these cases, and stated that the results created "considerable concern about

9   broad aspects of care in the outpatient practice of ophthalmology."  See Quon Decl., ¶ 10,

10  Ex. K.

11         Plaintiff was given the opportunity to review and respond to the Focused Practitioner

12  Review  results, and he submitted a written response.  Quon Decl., ¶ 11, Ex. L.  Plaintiff's

13  comments were provided to the Surgical Services Peer Review committee, and that group

14  reviewed all comments with input from ophthalmology specialists.  As a result, one of

15  plaintiff's scores went from a P-2 to a P-1 rating, while all others were affirmed.  Quon

16  Decl., ¶ 11, Exs. L-M.

17         The final results of the Focused Practitioner Review, and plaintiff's response thereto,

18  were submitted to the Kaiser Health Plan and Kaiser Hospital's CP Committee (which, as

19  noted at the outset, is responsible for all credentialing decisions related to Kaiser Health

20  Plan, and which recommends membership decisions to Kaiser Hospital's Professional Staff

21  Executive Committee).  On April 9, 2008, the CP Committee voted unanimously to

22  terminate plaintiff's Kaiser Health Plan credentials, and to recommend that plaintiffs' Kaiser

23  Hospital privileges be revoked, subject to all hearing rights.  See Stricker Decl., ¶ 14; Quon

24  Decl., ¶ 12.  The CP Committee then in fact recommended to the PSEC that plaintiff's

25  privileges and staff membership be revoked.  Stricker Decl., ¶ 16.  The PSEC agreed and

26  on June 6, 2008, the Vallejo Hospital's PSEC informed plaintiff that it had recommended to

27  the Kaiser Hospital Board of Directors that all privileges and staff membership be revoked.

28

United States District Court

For the Northern District of California

1    Stricker Decl., ¶ 16, Ex. E.

2        On May 11, 2008, plaintiff requested a hearing by the Judicial Review Committee

3    pursuant to Kaiser Hospital's Staff By-Laws and state law.  Stricker Decl., ¶ 15, Ex. D.  A

4    Fair Hearing Panel was then convened in September 2008, in a consolidated proceeding to

5    hear both the decision regarding plaintiff's credentials in connection with Kaiser Health

6    Plan, and the decision regarding plaintiff's privileges and staff membership at Kaiser

7    Hospitals.

8        The Fair Hearing is a hearing established pursuant to Cal. Bus. & Prof. Code §§ 809

9    through 809.92, and is referred to as a Section 809 hearing.  A Section 809 hearing

10   functions the same way as a jury trial, with an attorney functioning as judge, and a panel of

11   physicians serving as impartial trier of fact.  Discovery rights apply, as does the right to be

12   represented and call witnesses.  Plaintiff's Fair Hearing was overseen by Keith Bartel, an

13   attorney in private practice who was appointed as hearing officer.  Stricker Decl., ¶¶ 18-20.

14   Four physicians were drawn from among plaintiff's peers to serve as members of the

15   hearing panel, and plaintiff was given the opportunity to conduct voir dire of the hearing

16   panel and Mr. Bartel, and did so.  Plaintiff did not object to Mr. Bartel serving as hearing

17   officer, though he objected to one member of the hearing panel, which Mr. Bartel overruled.

18   Plaintiff chose to represent himself instead of hiring counsel.  Stricker Decl., ¶ 19.  The Fair

19   Hearing proceedings began in October 2008 and continued over several months, with the

20   last hearing occurring on May 6, 2009.  Stricker Decl., ¶ 20.

21       Dr. Stricker presented evidence on behalf of Kaiser Hospitals and Kaiser Health

22   Plan, and he decided to present evidence pertaining only to the nine cases rated as P-2

23   during the Focused Practitioner Review, and he also presented evidence of behavioral

24   concerns regarding plaintiff.  Plaintiff, in response argued at the hearing that there had

25   been no problems with his clinical performance in the nine cases, and denied any

26   behavioral concerns.  Plaintiff at no time raised disability as a mitigating factor.  Nor did he

27   contend that any practice errors had resulted from failure to provide a reasonable

28

United States District Court
For the Northern District of California

1    accommodation.  Stricker Decl., ¶¶ 21, 26, Ex. I.  Plaintiff did, however, elicit testimony to

2    the effect that where cases designating a P-2 standard of care occur, it is Kaiser's policy

3    that a performance improvement plan must be developed and provided to the physician –

4    something not done in plaintiff's case.  See Rogers Decl., Ex. 2D; Eisenberg Decl., ¶¶ 28,

5    32, Ex. 13.

6         During the course of the Fair Hearing, plaintiff requested numerous continuances

7    due to personal vacations, unavailability, and a purported car accident, as well as on

8    grounds of religious accommodation.  The scheduling of the Fair Hearing dates was within

9    the purview of Mr. Bartel, the hearing officer.  Mr. Bartel generally honored plaintiff's

10   requests for religious accommodation and avoided scheduling hearings on Saturdays, and

11   rescheduled hearings due to a religious holiday in October 2008.  Stricker Decl., ¶ 22.  In

12   relation to a hearing scheduled for February 27, 2009, plaintiff requested that a hearing be

13   rescheduled, because it would not be possible for him to return from the hearing to his

14   home in San Francisco before the beginning of the Jewish Sabbath, since he could not

15   drive once the Sabbath began.  Stricker Decl., ¶ 23.  Because the hearing had already

16   been scheduled, and due to the short notice associated with plaintiff's request, Mr. Bartel

17   declined to move the hearing, finding that to do so would pose an undue burden on the

18   attendees (witnesses and four physicians were scheduled to be present).  Stricker Decl., ¶

19   23, Ex. F.  Plaintiff asserts that, in denying him a request for a continuance, he was told

20   that if he did not attend the Friday hearing, a judgment would be entered against him.

21   Eisenberg, Decl. ¶ 30.

22        On June 15, 2009, the Fair Hearing Panel issued a 19 page written decision, and

23   unanimously voted to uphold the revocation of plaintiff's Kaiser Health Plan credentials by

24   the CP Committee, and affirming the CP Committee's recommendation to the PSEC that

25   plaintiff's staff membership and clinical privileges be terminated by Kaiser Hospitals.

26   Stricker Decl., ¶ 25, Ex. G.

27        Plaintiff subsequently exercised and exhausted further internal appeals to the

28

7

**United States District Court**
For the Northern District of California

1   Appellate Review Panel of the Kaiser Hospitals Board of Directors and the Kaiser Hospitals

2   Board of Directors itself, which both confirmed the revocation of Hospital privileges.

3   Stricker Decl., ¶ 25.  No further appeal was available with respect to the Kaiser Health

4   Plan's decision to de-credential plaintiff.  Stricker Decl., ¶ 26.

5        While the Fair Hearing was pending, plaintiff continued to practice medicine.

6   Stricker Decl., ¶ 24.  In February 2009, further concerns emerged regarding plaintiff's

7   practice.  A charge nurse lodged a complaint regarding plaintiff's failure to come into the

8   clinic when he was on call to examine a patient who had a retinal tear and who later

9   required surgery.  Additionally, it was noted by his new Chief of Ophthalmology, Dr.

10  Deanna Wilson, that plaintiff was becoming increasingly rude to patients, and was not

11  interacting with any fellow doctors other than one.  Stricker Decl., Ex. G.  This raised further

12  concerns about patient safety, and effective March 23, 2009, plaintiff was required to limit

13  his practice to taking and reading fundoscopic photographs for diabetic patients pending

14  the outcome of the Fair Hearing.  Stricker Decl., ¶ 24.  This resulted in a reduction of

15  plaintiff's workload and salary.

16  C.    Discrimination Facts

17       In 2007, plaintiff sent three complaints alleging harassment by Dr. Kolarik.  In

18  January 2007, plaintiff sent one complaint to the Joint Commission overseeing hospitals

19  and HMOs, and another to the EEOC.  Then, plaintiff sent another complaint of harassment

20  to Kaiser's CEO in March 2007.  On April 15, 2007, plaintiff again complained to Dr. Pearl

21  regarding Dr. Kolarik.

22       Plaintiff asserts that he began to experience stress on many levels, and that same

23  April 2007 (one year after Dr. Kolarik forwarded the first four cases to the Quality

24  Department for review), plaintiff unilaterally informed Dr. Kolarik that he would no longer be

25  performing any major surgery due to "health and safety" reasons.  Dr. Kolarik accepted this

26  decision, and plaintiff stopped performing major surgery.  Not until July 2007, in response

27  to repeated requests from Kaiser Medical Group's human resources department, did

28

1    plaintiff state that he had made the decision due to a medical condition that he described as

2    "stress, anxiety, and less steady hands."  Kolarik Decl., ¶ 8.

3    D.    Instant Action

4        After filing numerous EEOC complaints of discrimination, plaintiff filed the instant

5    action.  After withdrawing his ADEA claim, plaintiff now alleges two causes of action against

6    defendants: (1) violation of the Americans with Disabilities Act ("ADA"), and (2) violation of

7    Title VII.

8        Before the court are two motions for summary judgment: one brought by Kaiser

9    Medical Group, and the other brought by the Kaiser Health Plan and Kaiser Hospitals.

10   Defendants seeks summary judgment with respect to all remaining claims asserted in the

11   complaint.

**DISCUSSION**

13   A.    Legal Standard

14       Summary judgment is appropriate when there is no genuine issue as to material

15   facts and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

16   Material facts are those that might affect the outcome of the case.  Anderson v. Liberty

17   Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there

18   is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.

19       A party seeking summary judgment bears the initial burden of informing the court of

20   the basis for its motion, and of identifying those portions of the pleadings and discovery

21   responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp.

22   v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof

23   at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other

24   than for the moving party.  Southern Calif. Gas. Co. v. City of Santa Ana, 336 F.3d 885,

25   888 (9th Cir. 2003).

26       On an issue where the nonmoving party will bear the burden of proof at trial, the

27   moving party can prevail merely by pointing out to the district court that there is an absence

28

**United States District Court**
For the Northern District of California

9

1  of evidence to support the nonmoving party's case.  Celotex, 477 U.S. at 324-25.  If the

2  moving party meets its initial burden, the opposing party must then set forth specific facts

3  showing that there is some genuine issue for trial in order to defeat the motion.  See Fed.

4  R. Civ. P. 56(e); Anderson, 477 U.S. at 250.

5  B.    Legal Analysis

6         The summary judgment motions before the court collectively require analysis of the

7  following: (1) whether plaintiff can be deemed an 'employee' of all three Kaiser entities at

8  issue for purposes of plaintiff's wrongful termination suit; (2) whether there are triable

9  issues of fact with respect to plaintiff's disability discrimination claim under the ADA; (3)

10  whether there are triable issues of fact with respect to plaintiff's retaliation claim under the

11  ADA; (4) whether there are triable issues of fact with respect to plaintiff's religious

12  discrimination claim under Title VII; and (5) whether plaintiff's punitive damages request is

13  sufficiently supported by the evidentiary record.

14         1.    The 'Employee' Issue

15         It is undisputed that plaintiff was a shareholder in the Kaiser Medical Group,[2] and not

16  otherwise contractually associated with any other Kaiser entity.  While this suggests that

17  plaintiff was not employed by Kaiser Hospitals or Kaiser Health Plan and thus cannot hold

18  either liable for his discrimination claims, plaintiff nonetheless contends that he is an

19  employee of all three entities for purposes of his action.  As clarified by plaintiff's counsel at

20  the hearing on the motions, this argument rests on the general assertion of agency

21  principles.  Plaintiff contends, for example, that all three Kaiser entities are "branches of the

22  _____

23     [2]    The court notes that the parties have not discussed in detail whether plaintiff's
24  status as Kaiser Medical Group shareholder suffices to establish an employee-employer
   relationship between the two.  Rather, defendant stated at the hearing that it assumed for the
   purposes of argument that it does, and contends that even assuming an employee-employer
25  relationship, no liability ensues.  The court therefore also assumes the existence of an
   employment relationship between plaintiff and Kaiser Medical Group, in its analysis.  Had the
26  existence of any employment relationship between plaintiff and Kaiser Medical Group been
   adequately briefed, however, the court notes that such a discussion might have mooted the
27  remainder of the parties' arguments in connection with the merits of plaintiff's claims, as
   discussed herein.
28

**United States District Court**
For the Northern District of California

1   same tree" and are blended together "in a unity of purpose and activities so that the legal

2   fiction of separation must be ignored," thereby qualifying plaintiff as an employee of Kaiser

3   Hospitals and Kaiser Health Plan in addition to Kaiser Medical Group.

4        A detailed showing is required in order to demonstrate an employer-employee

5   relationship for purposes of both the ADA and Title VII.  In <u>Clackamas Gastroenterology</u>

6   <u>Associates, P.C. v. Wells</u>, 538 U.S. 440 (2003), the Supreme Court considered whether

7   physicians who were directors and shareholders of a clinic, could be deemed employees of

8   that clinic for purposes of the ADA.  The Court noted that Congress had intended the word

9   "employee" to describe "the conventional master-servant relationship as understood by

10  common-law agency doctrine." <u>Id</u>. at 445.  The Court then described six factors relevant to

11  determining whether a director is an employee: (1) whether the organization can hire or fire

12  the individual or set the rules and regulations of the individual's work; (2) whether and, if so,

13  to what extent the organization supervises the individual's work; (3) whether the individual

14  reports to someone higher in the organization; (4) whether and, if so, to what extent the

15  individual is able to influence the organization; (5) whether the parties intended that the

16  individual be an employee, as expressed in written agreements or contracts; and (6)

17  whether the individual shares in the profits, losses, and liabilities of the organization.  <u>Id</u>. at

18  449-50.  The Court also noted that these factors were not exhaustive, and that whether an

19  individual is an employee depends on "all of the incidents of the relationship[,] with no one

20  factor being decisive."  <u>Id</u>. at 450 n. 10, 451.

21        Similarly, in <u>Lutcher v. Musicians Union Local 47,</u> 633 F.2d 880, 883-84 (9th Cir.

22  1980), the Ninth Circuit noted that in order for Title VII protections to apply, "there must be

23  some connection with an employment relationship," even though the connection with

24  employment "need not necessarily be direct." The line between employment and non-

25  employment status depends "upon the economic realities of the situation."  A primary

26  factor, however, is "[t]he extent of the employer's right to control the means and manner of

27  the worker's performance...".  Additional factors are:  (1) the kind of occupation, with

28

United States District Court

For the Northern District of California

1    reference to whether the work usually is done under the direction of a supervisor or is done

2    by a specialist without supervision; (2) the skill required in the particular occupation; (3)

3    whether the "employer" or the individual in question furnishes the equipment used and the

4    place of work; (4) the length of time during which the individual has worked; (5) the method

5    of payment, whether by time or by the job; (6) the manner in which the work relationship is

6    terminated; i. e., by one or both parties, with or without notice and explanation; (7) whether

7    annual leave is afforded; (8) whether the work is an integral part of the business of the

8    "employer"; (9) whether the work accumulates retirement benefits; (10) whether the

9    "employer" pays social security taxes; and (11) the intention of the parties.  <u>See</u> 633 F.2d

10   880, 883-84.

11        Plaintiff's arguments, however, make no reference to any legal test for

12   demonstrating the existence of an employer/employee relationship, let alone does plaintiff

13   acknowledge the applicability of the foregoing factors.  Having failed to frame his argument

14   with reference to any of the requisite legal standards, plaintiff cannot come close to

15   satisfying any such standards.  At most, plaintiff submits his own declaration, with his 1987

16   employment application, and his March 31, 2009 resignation letter attached as exhibits.

17   <u>See</u> Eisenberg Decl., Exs. 1, 12.  But plaintiff's declaration recites only that "Kaiser" –

18   without differentiation as to any specific Kaiser entity – established rules and guidelines for

19   his practice, and had control over his staff.  And the employment application and

20   resignation letter attached to plaintiff's declaration only generally suggest an

21   interlatedness between the Kaiser entities, but do nothing to explain or demonstrate how

22   any of the foregoing factors are met for purposes of the employee-employer relationship

23   test.  As such, plaintiff's declaration provides no concrete guidance or proof on the

24   employer-employee question.  <u>See also, e.g., FTC v. Publ'g Clearing House Inc.</u>, 104 F.3d

25   1168, 1171 (9th Cir.1997) ("A conclusory, self-serving affidavit, lacking detailed facts and

26   any supporting evidence, is insufficient to create a genuine issue of material fact.").

27        The court furthermore notes that it is not clear that plaintiff could demonstrate the

28

12

United States District Court
For the Northern District of California

1    existence of any employee-employer relationship, even with adequate evidentiary support.

2    See, e.g., Wojewski v. Rapid City Regional Hosp., Inc., 450 F.3d 338, 343-44 (8th Cir.

3    2006)(doctor challenging termination of hospital privileges was an independent contractor,

4    not an employee); Shah v. Deaconess Hosp., 355 F.3d 496, 500 (6th Cir. 2004)(doctor with

5    surgical privileges was not an employee for Title VII purposes); Alexander v. Rush North

6    Shore Medical Center, 101 F.3d 487, 494 (7th Cir. 1996)

7            In sum, however, by neither focusing on the legal tests that apply nor submitting

8    appropriate evidence that would demonstrate the satisfaction of any such tests, plaintiff has

9    fallen far short of his burden in establishing that he is an employee of either Kaiser Health

10   Plan or Kaiser Hospital, for purposes of his Title VII and ADA claims.  Thus, plaintiff cannot

11   assert his Title VII or ADA claims against Kaiser Health Plan or Kaiser Hospitals, since it is

12   undisputed that in name, if he is any Kaiser entity's employee, it would be Kaiser Medical

13   Group only.

14           For these reasons, defendants Kaiser Health Plan's and Kaiser Hospitals' motion for

15   summary judgment is GRANTED as to all claims asserted by plaintiff, on the basis that

16   plaintiff cannot demonstrate a triable issue of fact as to whether these defendants were

17   plaintiff's employer for purposes of Title VII and ADA liability.

18           The court furthermore notes that, even if plaintiff had been able to so demonstrate,

19   plaintiff's claims would nonetheless ultimately still fail against defendants on their merits, for

20   the same reasons as are discussed below with respect to remaining defendant Kaiser

21   Medical Group.

22           2.    Disability Discrimination Under the ADA

23           The heart of plaintiff's claim against remaining defendant Kaiser Medical Group is

24   that defendant has discriminated against plaintiff on the basis of a disability.  Plaintiff

25   specifically contends that he had a physical or mental impairment, in that he suffers from

26   clinical depression and anxiety, with a resulting medical condition that affects the

27   steadiness of plaintiff's hands, and ensuing ability to perform safely in an operating room

28

United States District Court

For the Northern District of California

1   environment.  To that end, on April 25, 2007, plaintiff gave defendants written notice of his

2   cessation of major surgery due to health concerns.  According to plaintiff, shortly thereafter,

3   defendant began steps to take adverse action against plaintiff in the form of the Focused

4   Practitioner Review – which, plaintiff asserts, supports a claim for disability discrimination

5   under the ADA.

6       Disparate treatment claims under the ADA are analyzed under the burden-shifting

7   framework of McDonnell-Douglas.  In general, to establish a prima facie case for disparate

8   treatment, a plaintiff must prove that (1) she was a member of a protected class; (2) she

9   was performing her job in a satisfactory manner; (3) she was subjected to an adverse

10  employment action; and (4) employees not in the protected class were not treated similarly.

11  Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998); see also Coleman v.

12  Quaker Oats Co., 232 F.3d 1271, 1281 (9th Cir. 2000).  As applied to the ADA, a plaintiff's

13  prima facie case of discrimination based on a disability must show that plaintiff: (1) is

14  disabled; (2) is qualified; and (3) suffered an adverse employment action because of his

15  disability.  Snead v. Metropolitan Prop. & Cas. Ins. Co., 237 F.3d 1080, 1087 (9th Cir.

16  2001).  If plaintiff establishes a prima facie case, the burden shifts to the defendant to

17  articulate a legitimate, nondiscriminatory reason for the adverse employment action.  Id. at

18  1093-94. If the defendant does so, the burden shifts back to the plaintiff to produce

19  evidence that the articulated reason is pretextual.  Id.

20      For purposes of the ADA, an individual is "disabled" if s/he has a "physical and

21  mental impairment that substantially limits one or more of the major life activities of such

22  individual; a record of such an impairment; or being regarded as having such an

23  impairment."  42 U.S.C. § 12102(2); see also Sutton v. United Airlines, 527 U.S. 471, 482

24  (1999)("A disability exists [if] an impairment substantially limits a major life activity.").  Major

25  life activities include "functions such as caring for oneself, performing manual tasks,

26  walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. §

27  1630.2(1).  "To be substantially limited in the major life activity of working, . . . one must be

28

14

United States District Court
For the Northern District of California

1    precluded from more than one type of job, a specialized job, or a particular job of choice."

2    Sutton, 527 U.S. at 492.  Rather, a plaintiff must prove that the employer regarded the

3    individual as precluded from a "class of jobs or a broad range of jobs in various classes."

4    Id. at 491.  An individual is considered a "qualified individual with a disability" if the

5    individual can perform the essential functions of the position held or desired with or without

6    reasonable accommodation.  29 C.F.R. § 1630.2(o).

7          With these standards in mind, plaintiff's claim is deficient in several respects.  To

8    begin with, plaintiff offers no evidence, other than his own declaration, to demonstrate that

9    his depression and stress symptoms – including inability to focus or sleep – substantially

10   limited his major life activities.  See Eisenberg Decl., ¶¶ 16, 19, 21-24.  According to

11   plaintiff, he was unable to sit or stand in one position for more than 10 minutes, and this,

12   combined with his depression and anxiety, substantially impaired the life activities of

13   thinking, concentrating, sleeping, and working.  See Pl. Opp. Br. at 14:2-9.[3]  However,

14   other than his own self-serving statement, plaintiff points to no other record of such

15   impairment prior to April 2007, nor any other evidence demonstrating that others –

16   including Kaiser Medical Group – believed him to be so impaired.[4]  See,.e.g.  FTC v. Publ'g

17   Clearing House Inc., 104 F.3d at 1171.  Furthermore, based on his own self-reporting of

18   symptoms and without other corroborating evidence, plaintiff cannot be said to have been

19   significantly restricted in any major life activities.  See, e.g., Houlihan v. Lucky Stores, Inc.,

20   87 F.3d 362, 366 (9th Cir.)(store manager not "disabled" by depression and stress because

21

22          [3]     Plaintiff has cited in his opposition brief to Exhibit B of the Robinow Deposition.
23   However, the court finds no reference to any authenticated portion of the Robinow deposition,
     or to Exhibit B of same, in the declarations submitted by plaintiff in support of his motion.

24          [4]     Plaintiff does submit two cursory letters from plaintiff's treating physician, Dr.
25   Joseph Robinow, stating that plaintiff was being treated for "clinical depression" in October
     2008 and obliquely referencing a "prior disability" at some point prior to July 2008, see
26   Eisenberg Decl., Ex. 9.  However, neither of these support the existence of any qualifying
     disability prior to April 2007.  In fact, plaintiff's own declaration rather confusingly states that
27   he was first treated by Dr. Robinow in July of 2007.  Eisenberg Decl., ¶ 22.  Quizzically, then,
     plaintiff's first treatment for his disability occurred after the April date upon which plaintiff first
28   unilaterally asserted the existence of his disability.

United States District Court

For the Northern District of California

1   did not significantly restrict, even if it impacted, manager's ability to sleep, concentrate, in

2   comparison to average person).  In short, plaintiff has failed to create a triable issue of fact

3   with respect to the existence of any disability under the ADA.

4        Second, plaintiff cannot establish that he suffered an adverse employment action

5   because of any disability.  As plaintiff's counsel clarified at the hearing, plaintiff contends

6   that the adverse action he suffered was defendant's decision to undertake the Focused

7   Practitioner Review that ultimately found that plaintiff fell below the standard of care in nine

8   P-2 cases.  According to plaintiff, this adverse action began on June 15, 2007, the point at

9   which defendant purportedly began soliciting high risk, high volume, difficult patient cases

10  to include in the Focused Practitioner Review.  Plaintiff asserts that the solicitation of high

11  risk cases was sufficiently close in time to the April 25, 2007 date on which plaintiff

12  informed Dr. Kolarik of his need to stop surgery due to health reasons, such that a causal

13  relationship has been demonstrated between defendant's knowledge of plaintiff's disability,

14  and the adverse action taken against him.

15       As defendant notes, however, plaintiff's argument is belied by the undisputed facts,

16  which actually demonstrate that the Focused Practitioner Review that constitutes the

17  "adverse action" that plaintiff complains of, began far earlier than the April 25, 2007 date on

18  which plaintiff first informed Dr. Kolarik of his purported disability.  For example: in August

19  of 2006, four of Dr. Eisenberg's cases had come to the attention of the Quality Department

20  at Kaiser Hospital Vallejo and were shortly thereafter submitted for peer review; on August

21  28, 2006, Dr. Sarah McCarthy, the Associate Physician in Chief for Risk at Kaiser Medical

22  Group, sent an e-mail within the Quality Department stating that "the number of cases [and

23  apparent record-keeping irregularities by Dr. Eisenberg raised] concerns that a focused

24  practice review may be indicated;" throughout fall 2006 and spring 2007, Surgical Services

25  Peer Review meetings were held during which plaintiff's cases were found to have

26  significant deviations from the standard of care.  See Quon Decl., ¶¶ 2, 5; id., Exs. A-E.

27  Then, based in part on these results, the Focused Practitioner Review began to solicit

28

United States District Court

For the Northern District of California

1    plaintiff's cases for review in June and July 2007.  Quon Decl., ¶¶ 6-7; id., Ex I; see

2    Declaration of William J. Rogers ISO Summ. Judgment Opp. ("Rogers Decl."), Ex. A.  All of

3    which demonstrates that insofar as the peer review of plaintiff's cases and the resulting

4    Focused Practitioner Review are concerned, the wheels for both were set in motion as

5    early as August 2006 – well before the April 2007 date on which plaintiff informed his

6    supervisor about his purported disability.  As such, plaintiff fails to create a triable issue of

7    fact as to whether defendant undertook any adverse action against him because of, or on

8    the basis of, any disability.

9        In sum, and based on the foregoing, plaintiff cannot demonstrate either that he was

10   disabled, or that there is any temporal link between disclosure of any such disability and

11   any adverse action taken against him, such that a causal connection might be established

12   between the two.  As such, plaintiff fails to establish a triable issue of fact as to a prima

13   facie claim for disability discrimination, and defendant's motion for summary judgment is

14   accordingly GRANTED with respect to this claim.

15       The court also notes, moreover, that even if plaintiff had come forward with sufficient

16   evidence to establish a triable issue as to a prima facie claim for disability discrimination,

17   the undisputed evidence would nonetheless support a finding that defendant had a

18   legitimate nondiscriminatory reason for terminating its relationship with plaintiff.  Plaintiff

19   does not dispute, for example, that as noted above, several of his cases came to the

20   attention of the Quality Department at Kaiser Hospital Vallejo in August 2006 and were

21   shortly thereafter submitted for peer review; that this process led to a Focused Practitioner

22   Review; or that he exercised his rights to a Fair Hearing before a committee prior to the

23   decision to revoke his credentials; or that, without credentials to provide services to

24   members of Kaiser Foundation Health Plan, plaintiff was unable to provide medical

25   services to defendant's clientele.  See, e.g., Stricker Decl., ¶ 3; id., Ex. A at 11.D

26   (defendant policy noting that all physicians "must maintain credentials necessary to treat

27   Kaiser Foundation Health Plan members).  Thus, because defendant was prevented from

28

1 | employing any physician without the necessary credentials as a matter of policy, defendant

2 | had a legitimate and nondiscriminatory reason for terminating plaintiff.

3 |        3.    <u>Retaliation Claim Under the ADA</u>

4 |      Plaintiff also contends that defendant Kaiser Medical Group retaliated against him in

5 | violation of the ADA. While the precise contours of plaintiff's retaliation claim are not wholly

6 | clear to the court, plaintiff appears to contend that the Focused Practitioner Review that

7 | was conducted was a retaliatory action undertaken by defendant in response to plaintiff's

8 | submission of complaints to the Equal Employment Opportunity Commission ("EEOC") in

9 | January of 2007 and March of 2007, about purported harassment that plaintiff was

10 | receiving at the hands of Dr. Kolarik.

11 |      In order to make out a prima facie case of retaliation, a plaintiff must establish "that

12 | [he or she] acted to protect [his or her] rights, that an adverse employment action was

13 | thereafter taken against [him or her], and that a causal link exists between those two

14 | events." <u>See Steiner v. Showboat Operating Co.</u>, 25 F.3d 1459, 1465 (9th Cir.1994).

15 |      Plaintiff's retaliation claim, like the disability discrimination claim, has significant

16 | problems. First, the undisputed facts once again disclose a timing problem. As indicated in

17 | connection with the foregoing disparate treatment claim, the events that set the Focused

18 | Practitioner Review in motion actually commenced in August 2006, when Dr. Kolarik first

19 | forwarded complaints as to the quality of plaintiff's medical care on to the Quality

20 | Department. Since this is well before the January and March 2007 dates on which plaintiff

21 | purportedly engaged in his protected activity, plaintiff cannot demonstrate that the Focused

22 | Practitioner review was in fact conducted as a retaliatory response to plaintiff's filing of any

23 | EEOC complaints.

24 |      Second, and most significant, there is simply no evidence provided by plaintiff that

25 | suggests that his complaints to the EEOC had anything at all to do with a disability.

26 | Neither plaintiff nor the evidence posits as much and given that plaintiff concedes that he

27 | first notified Dr. Kolarik of his disability on April 25, 2007, it is improbable that plaintiff's

28 |

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  earlier complaints in January and March of 2007 could have highlighted any harassment

2  that plaintiff was receiving at the hands of Dr. Kolarik because of his disability.  Indeed, as

3  has already been noted, plaintiff submits no proof that defendant was even aware of his

4  disability at any time prior to plaintiff's April 2007 letter unilaterally informing defendant of

5  such.  As such, plaintiff cannot demonstrate that he engaged in protected activity in order

6  to protect his rights as secured by the ADA specifically, let alone that defendant retaliated

7  against him as a direct result of plaintiff having done so.

8       All of which demonstrates that, as with plaintiff's disparate treatment claim, plaintiff

9  has failed to establish a triable issue of fact as to a prima facie case for retaliation under

10  the ADA.  For this reason, the court also GRANTS summary judgment in favor of Kaiser

11  Medical Group, with respect to plaintiff's retaliation claim pursuant to the ADA.

12       4.    Religious Discrimination Claim Under Title VII

13       Plaintiff asserts a claim for discrimination against Kaiser Medical Group on the basis

14  of his religious affiliation (plaintiff is Jewish).  Specifically, plaintiff asserts as a basis for his

15  religious discrimination claim that the fair hearing officer, Mr. Bartel, failed to accommodate

16  his need to reschedule a Fair Hearing date on February 27, 2009, due to plaintiff's

17  requested need to be home on the Sabbath.[5]

18       As already noted, in order to establish a claim for discrimination under Title VII, a

19  plaintiff must establish:  (1) he was a member of a protected class; (2) he was performing

20  her job in a satisfactory manner; (3) he was subjected to an adverse employment action;

21  and (4) employees not in the protected class were not treated similarly.  Godwin v. Hunt

22  Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998); see also Coleman v. Quaker Oats Co.,

23  232 F.3d 1271, 1281 (9th Cir. 2000).  As with ADA claims, Title VII claims are subject to

24  McDonnell Douglas burden shifting analysis.  See McDonnell Douglas Corp. v. Green, 411

25

26       [5]    Plaintiff originally asserted as an additional basis for his religious discrimination
27  claim that at some point in time (he cannot remember when), Dr. Kolarik placed a "santa hat"
   on plaintiff's head.  However, plaintiff's counsel withdrew this argument at the hearing on the
28  instant motions.

United States District Court
For the Northern District of California

1   U.S. 792, 802 (1973); Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1220 (9th Cir. 1998).

2   Moreover, as defendant notes, in order to establish religious discrimination on the basis of

3   failure to accommodate, plaintiff must establish that the "employer discharged, threatened,

4   or otherwise subjected him to adverse employment action because of his inability to fulfill

5   the job requirement."  Heller v. EBB Auto Co., 8 F.3d 1433, 1438 (9th Cir. 1993).

6           Here, plaintiff falls far short of the mark.  As a preliminary matter, Mr. Barton is

7   neither a party to this lawsuit, nor is it disputed that he was not an employee of any of the

8   Kaiser entities, but rather an independent private neutral hired to preside as judge over the

9   Fair Hearing process.  As such, plaintiff cannot hold Kaiser Medical Group responsible for

10  any conduct undertaken by Mr. Barton.  And while plaintiff blithely asserts that Mr. Barton

11  was an "agent" for Kaiser Medical Group, plaintiff does absolutely nothing to establish the

12  existence of an agency relationship.  Nor is it likely that he could: as defendant points out,

13  as an individual acting in a quasi-judicial capacity as a hearing officer appointed pursuant to

14  state law, Mr. Barton is entitled to immunity for his decisions made in overseeing the

15  hearing process.  See Wasyl, Inc. v. First Boston Corp., 813 F.2d 1579, 1582 (9th Cir.

16  1987).  A scheduling decision would fall within this scope, thereby immunizing Mr. Barton

17  from Title VII liability.

18          Accordingly, based on the foregoing reasons, the court GRANTS summary judgment

19  in Kaiser Medical Group's favor, with respect to plaintiff's Title VII claim alleging religious

20  discrimination.

21          5.      Punitive Damages Request

22          Finally, defendant seeks summary judgment with respect to plaintiff's request for

23  punitive damages.  As a general matter, evidence of fraud, malice, or oppression – as is

24  required in order to support an award of punitive damages – must be supported by clear

25  and convincing evidence.  See, e.g., Basich v. Allstate Ins. Co., 87 Cal. App. 4th 1112,

26  1118-19, 1121 (2001)("If the plaintiff is going to prevail on a punitive damages claim, he or

27  she can only do so by establishing malice, oppression or fraud by clear and convincing

28

United States District Court

For the Northern District of California

1   evidence. Thus, any evidence submitted in response to a motion for summary adjudication

2   must necessarily meet that standard."). Cases that recognize an award of punitive

3   damages based on claims of malice or oppression, as appears to be the case here,

4   consider malice or oppression to be shown where "despicable conduct" has been

5   demonstrated. Despicable conduct is generally considered to be "conduct which is so vile,

6   base, contemptible, miserable, wretched or loathsome that it would be looked down upon

7   and despised by ordinary decent people." Tomaselli v. Transamerica Ins. Co., 25 Cal. App.

8   4th 1269, 1287 (1994). Such conduct has been described as "[having] the character of

9   outrage frequently associated with crime." Id.

10      Here, plaintiff has failed to come forward with evidence of the type of conduct that

11  would rise to the level of despicable conduct sufficient to support an award of punitive

12  damages. Plaintiff makes almost no attempt to introduce evidence that would support

13  evidence of despicable conduct, stating only in conclusory fashion that the failure to provide

14  a Performance Improvement Plan constitutes grounds for punitive damages. However,

15  even if true, defendant's failure to provide a Performance Improvement Plan provides an

16  insufficient basis upon which to base a finding of 'despicable conduct' – or an award of

17  punitive damages.[6]

18      The court accordingly GRANTS defendant's motion with respect to punitive

19  damages.

20  C.    Conclusion

21      For all the foregoing reasons, the court hereby GRANTS defendants' motions for

22  summary judgment. The February 27, 2012 trial date having already been vacated, the

23  //

24  //

25  //

26  

27      [6]      Moreover, having found no basis for liability of defendant, the punitive damages

28  issue is moot.

21

1  clerk shall close the file.

2  **IT IS SO ORDERED.**

3  Dated: January 20, 2012

4  _____
   PHYLLIS J. HAMILTON
   United States District Judge